IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES D. EVANS, ) | |
| Plaintiff ) | |
| ) | |
| vs. ) | Civil Action No. 07-230J |
| ) | Chief Magistrate Judge Amy Reynolds Hay |
| GERALD L. ROZUM, Superintendent; ) | |
| JOSEPH VISINSKY, Chief Health Care ) | |
| Administrator; DR. TIMOTHY McGRATH,) | |
| Medical Director; PRISON HEALTH ) | |
| SERVICES, INC.; PENNSYLVANIA ) | |
| DEPARTMENT OF CORRECTIONS; ) | |
| STEVEN M. GATES, Deputy ) | |
| Superintendent; DANIEL J. GEHLMANN, ) | |
| Major; LT. JOHN DOE; SUE DARR, ) | |
| MAILROOM SUPERVISOR, ) | Re Dkt. Nos. [121]; [131]; [137]; and [157] |
| Defendants ) | |

## MEMORANDUM OPINION

HAY, Chief Magistrate Judge

This is a prisoner civil rights case, which was the subject of earlier proceedings in which the Court granted in part and denied in part motions to dismiss filed by the two sets of defendants.  Dkt. [83] (memorandum opinion).  Familiarity with that earlier memorandum opinion and order, disposing of the motions to dismiss is presumed.  As a consequence of the earlier proceedings, only the following claims remain: (1) two Section 1983 claims for (a) deliberate indifference against all of the defendants and (b) retaliation claims against all of the defendants under the First Amendment; (2) ADA retaliation claims against all of the defendants; (3) retaliation claims under the Rehabilitation Act against all of the defendants; (4) state constitutional law claims against all defendants; (5) a claim for punitive damages against all defendants; and (6) a state law claim of intentional infliction of emotional distress against PHS and Dr. McGrath.

**Procedural and Factual History**

James D. Evans ("Plaintiff") is a state prisoner incarcerated at SCI-Somerset.  The

Second Amended Complaint is the operative complaint.  Dkt. [36].  The operative complaint

named the following defendants: Gerald Rozum, Superintendent of SCI-Somerset; Joseph

Visinsky, Health Care Administrator; Steven Gates, Deputy Superintendent of SCI-Somerset;

Daniel Gehlman, Major of Security; Lt. John Doe (in charge of RHU on January 13, 2008),

subsequently identified as Richard Doyka; and the Department of Corrections (collectively, "the

DOC Defendants")[1] as well as Dr. Timothy McGrath, the Medical Director at SCI-Somerset, and

Prison Health Services, Inc. ("PHS"), the private company hired by DOC to provide health care

to the inmates at SCI-Somerset.  The court will refer to Dr. McGrath and PHS as "the Medical

Defendants."  Plaintiff has named all of the natural person defendants in both their individual and

official capacities.

Plaintiff filed a motion for summary judgment, Dkt. [121], a brief in support, Dkt. [122],

a pretrial statement, Dkt. [123], a concise statement of material facts, Dkt. [124], and Plaintiff's

second appendix of exhibits, numbered 23 to 55, Dkt. [125].   Plaintiff had earlier filed a partial

motion for summary judgment, Dkt. [72], which was mooted by his filing of the present

summary judgment motion.  In support of the partial summary judgment motion, Plaintiff

submitted exhibits, numbered 1 to 22, Dkt. [76], to which he refers in support of his present

summary judgment motion and in opposition to the Defendants' summary judgment motions.

The Medical Defendants filed their response to Plaintiff's summary judgment motion,

Dkt. [139], and their counter statement of facts, opposing Plaintiff's statement of material facts,

---

[1]  The operative complaint also named a Sue Darr, Mailroom supervisor but she was subsequently
terminated as a party defendant.  Dkt. [92].

Dkt. [140].  The DOC Defendants filed their counter statement of facts, opposing Plaintiff's

statement of facts, Dkt. [150], and an appendix of exhibits in support thereof, Dkt. [151], and

their response to Plaintiff's summary judgement motion, Dkt. [152].

There were some intervening proceedings in which Plaintiff sought to strike many of the

affidavits of the Defendants, which proceedings resulted in the striking of the affidavits, but

thereafter amended affidavits were ultimately permitted to be filed to cure the deficiencies.

Ultimately,  Plaintiff filed a responsive pleading to the Medical Defendants' Counter Statement

of Material Facts.  Dkt. [166](which is wrongly identified on the docket as a "Brief").  Plaintiff

also filed a responsive pleading to the DOC Defendants' Counter Statement of Material Facts.

Dkt. [174].

In the meanwhile, the DOC Defendants filed their own motion for summary judgment,

Dkt. [131], a brief in support, Dkt. [132], and a Concise Statement of Material Facts, Dkt. [133]

(with evidentiary materials attached).

Similarly, the Medical Defendants filed a Concise Statement of Material Facts, Dkt.

[135], an appendix of evidentiary materials, Dkt. [136], their summary judgment motion, Dkt.

[137], and a brief in support of their summary judgment motion, Dkt. [138].  In the Medical

Defendants' brief in support of their summary judgment motion, they incorporated the arguments

made by the DOC Defendants in support of the DOC Defendants' summary judgment motion

and brief.  Dkt. [138] at 16.

Thereafter, the DOC defendants filed a supplemental motion for summary judgment, Dkt.

[147], incorporating the brief in support of the summary judgment motion that the Medical

Defendants had previously filed, i.e., Dkt. [138].

3

Plaintiff filed his counter statement of material facts in opposition to the DOC Defendants' statement of material facts. Dkt. [159]. Plaintiff also filed a brief in opposition to the DOC Defendants' Motion for Summary Judgment and Supplemental Motion for Summary Judgment. Dkt. [168]. In addition, Plaintiff filed his counter statement of material facts in opposition to the Medical Defendants' statement of material facts. Dkt. [160]. Simultaneous to the filing of Plaintiff's counter statement, he also filed two sets of evidentiary appendices: Dkt. [161], Plaintiff's Third Appendix with exhibits numbering 56 to 63, and Dkt. [162], Plaintiff's Fourth Appendix with exhibits numbering 64 to 84. Later, Plaintiff filed his brief in opposition to the Medical Defendants's motion for summary judgment. Dkt. [169]. Plaintiff also filed his Fifth Appendix of Evidentiary Materials with Exhibits numbering 85-96, Dkt. [170].[2]

The summary judgment motions are now ripe for disposition. All parties have consented to have the Magistrate Judge exercise plenary jurisdiction and enter final judgment. Dkt. Nos. [34]; [43]; [69]; [70] & [71].

---

[2] On May 8, 2009, Plaintiff filed a motion for extension of time in which to file a responsive pleading to the Medical Defendants' Counter Statement of Material facts that opposed Plaintiff's summary judgment motion. Dkt. [163]. On May 14, 2009, prior to the Court ruling on Dkt. [163], Plaintiff filed that responsive pleading. Dkt. [166]. On May 15, 2009, Plaintiff filed a motion for an extension of time in which to file his sur reply to the DOC Defendants' response to Plaintiff's Summary Judgment motion and to file his responsive pleading to the DOC Defendants's Counter Statement of Material Facts, opposing Plaintiff's Statement of Material Facts. Dkt. [167]. Prior to the Court ruling on Dkt. [167], Plaintiff filed his responsive pleading to the DOC Defendants' Counter Statement of Material Facts. Dkt. [174]. Notwithstanding the fact that Plaintiff filed that which he sought to file in his two motions for extensions of time, i.e., Dkt. Nos. [163] and [167], the Court granted those motions for extensions of time, giving him until August 7, 2009, in which to file that which he had seemingly already filed. Dkt. [181].

     Lastly, the Court notes that the docket sheet incorrectly identifies Plaintiff's motion filed at Dkt. [167] as one seeking an extension of time in which to file a response to Dkt. [139] (i.e., the **Medical** Defendants' response to Plaintiff's summary judgment motion) and Dkt. [140], (i.e., the **Medical** Defendants' Counter Statement of Material Facts, opposing Plaintiff's Statement of Material Facts). Plaintiff's motion for extension of time, Dkt. [167], should have been linked to Dkt. [152] (i.e., the **DOC** Defendants' response to Plaintiff's summary judgment motion) and to Dkt. [151] (i.e., the **DOC** Defendants' Counter Statement of Material Facts).

**Standard of Review**

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden to show or point out why there is no genuine issue of material fact.  Walters ex rel. Walters v. General Motors Corp., 209 F.Supp.2d 481, 484 (W.D. Pa. 2002).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial . . ." or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In reviewing the summary judgment evidence, the Court has no duty to search the record for triable issues; rather, it need rely only on those portions of the evidentiary record to which the nonmoving party directs its attention.  See Guarino v. Brookfield Township Trustees, 980 F.2d 399, 403 (6th Cir. 1992).

"The substantive law governing the dispute will determine which facts are material, and only disputes over those facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  DeHart v. Horn, 390 F.3d 262, 267 (3d Cir. 2004)(internal quotations omitted).  An issue of material fact is genuinely disputed only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  "Where the record taken as a whole could

5

not lead a reasonable trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita, 475 U.S. at 587.  The inquiry involves determining whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990).  If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted.  Anderson, 477 U.S. at 249-50.  Moreover, it is not enough for the nonmovant to show that there is some dispute as to facts, rather, "only disputes over facts that might affect the outcome of the suit will prevent summary judgment."  Anderson, 477 U.S. at 248.  Accord Rexnord Holdings v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994) ("[T]he mere existence of *some* factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]"); Dykes v. DePuy, Inc., 140 F.3d 31, 36 (1st Cir. 1998) ("summary judgment is not precluded by just any factual quibble").

In short, the summary judgment motion is an evidence testing device to see if there is sufficient evidence to support a party's position with respect to an issue for which that party bears the burden of proof at trial so as to justify holding a trial.  See, e.g., Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001)(summary judgment "is the . . .  moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.").

**Discussion**

As noted above there are two section 1983 claims remaining.  One is for deliberate indifference in violation of the Eighth Amendment standards.  The second is for retaliation in violation of the First Amendment standards.

In order to

> make out a claim under Section 1983, a plaintiff must demonstrate that the conduct of which he is complaining has been committed under color of state or territorial law and that it operated to deny him a right or rights secured by the Constitution and laws of the United States. The plaintiff must also establish that it was the acts of the defendant which caused the constitutional deprivation.

Mosley v. Yaletsko, 275 F.Supp.2d 608, 613 (E.D.Pa. 2003)(citations omitted).

### A.  Eighth Amendment Deliberate Difference Claims

The Supreme Court has explained that analysis of a violation of the Eighth Amendment standards[3] involves a two pronged inquiry: (1) an objective inquiry into the qualitative nature of the harm suffered by the victim of the alleged punishment, and (2) a "subjective inquiry" into the mind of the person inflicting the harm.  See Wilson v. Seiter, 501 U.S. 294 (1991).  The plaintiff bears the burden of proof as to both the subjective and objective prongs for, as the Court of Appeals has explained, in order to "survive a summary judgment on an Eighth Amendment claim

---

[3] Technically, the Eighth Amendment applies to the states through the Fourteenth Amendment.  See Estelle v. Gamble, 429 U.S. 97, 101-02 (1976) (citing Robinson v. California, 370 U.S. 660 (1962)).  The standards of the Eighth Amendment barring the federal government from inflicting cruel and unusual punishments are the standards applicable to the States through incorporation by the Fourteenth Amendment's due process clause.  See Sistrunk v. Lyons, 646 F.2d 64, 66-67 (3d Cir. 1981)(citing Robinson v. California).  The standards under the Eighth Amendment and the standards under the Fourteenth Amendment are fundamentally identical. Furman v. Georgia, 408 U.S. 238, 422 n.4 (1972) (Blackmun, J., dissenting) ("the tests for applying these two provisions are fundamentally identical."); Berry v. City of Muskogee, 900 F.2d 1489, 1494 n.6 (10th Cir. 1990).  With this understanding, the Court will generally refer merely to the Eighth Amendment.

The same is true of Plaintiff's claims under the First Amendment, which technically applies to the States via incorporation into the Fourteenth Amendment's substantive due process clause.  See, e.g., Shrum v. City of Coweta, Okla., 449 F.3d 1132, 1141 (10th Cir. 2006).  The standards of the First Amendment made applicable to the States are the exact same standards applicable as against the Federal government.  Wallace v. Jaffree, 472 U.S. 38, 49 (1985)("Until the Fourteenth Amendment was added to the Constitution, the First Amendment's restraints on the exercise of federal power simply did not apply to the States.  But when the Constitution was amended to prohibit any State from depriving any person of liberty without due process of law, that Amendment imposed the **same** substantive limitations on the States' power to legislate that the First Amendment had always imposed on the Congress' power.")(emphasis added, footnotes deleted).  With this understanding, the Court will generally refer merely to the First Amendment.

asserted under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997).  In cases such as this one  - which involves a purported denial of medical care  - to prove the subjective component of an Eighth Amendment claim, a plaintiff has the burden of proving that the defendant acted with deliberate indifference.  Estelle v Gamble, 429 U.S. 97 (1976); Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001). "Deliberate indifference" occurs when a prison "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).  As a corollary of the deliberate indifference standard, negligence by staff at the prison, medical personnel and physicians in treating prisoners is not sufficient to state an Eighth Amendment violation.  Estelle, 429 U.S. at 105-06.  Mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th  Cir. 1985).

We take up the DOC Defendants' motion for summary judgment first.  The DOC Defendants  eventually provided affidavits and medical records that met the requirements of Fed.R.Civ.P. 56, which they point to as indicating that the record lacks evidence of the subjective prong of deliberate indifference as well as the objective prong.  See Dkt. [188].  This was sufficient to meet their initial summary judgment burden so as to shift the burden to Plaintiff to come forward with his evidence.  Plaintiff's first Eighth Amendment claim seems to be the following: 1) denial of bowel program supplies from Sunday January 13, 2008 to Thursday, January 17, 2008.  See, e.g., Dkt. [16] at 13, ¶ 51 (but Plaintiff claims this denial was from Friday

January 11, 2007, at 10:30 pm, which was the last time he did his bowel program with all of the necessary supplies.  However, he was, in fact, not denied his complete supplies until January 13, 2008, when he requested them); id., at 14, ¶ 56.

The summary judgment record, read in a light most favorable to Plaintiff establishes that when he was sent into the RHU for a disciplinary violation on Sunday January 13, 2008, at approximately 7:40 A.M. (Dkt. [16] at 10, ¶ 34), Defendant Doyka, not knowing exactly what supplies Plaintiff was medically required to have in order to do his bowel program, Dkt. [133] at 5, ¶ 41, ordered around 11 A.M., (see id. at ¶¶ 37-38) that Plaintiff not receive lubricant, and only receive some but not all of the other supplies Plaintiff was ordered to have by Dr. McGrath in order to do his bowel program. Lt. Doyka made these orders based apparently upon heightened security concerns attendant upon Plaintiff being in the RHU.  See Dkt. [133] at 5, ¶ 37.  Plaintiff claims he was denied some of his supplies to do the bowel program, even though Plaintiff asserts that during prior stays in the RHU, he was permitted to have all of his supplies.   As a consequence of him being denied all of his supplies in the RHU on January 13, 2008,  Plaintiff filed an Accommodation Request to Defendant Visinsky on January 13, 2008 but which was not stamped received by the medical department until the following day.  Dkt. [76-17] at 1.  The entire text of the accommodation request was as follows:

> Dear Sir,
> I am filing this under DC ADM 006 Accomodation [sic] Request. I am a T12/L1 paraplegic  [and] I do a bowel program [and] use a foley catheter [and] night drange [sic, possibly "drainage"] bag/leg bag.
> I am requesting an accomodation [sic] as follows:
> 1[.] to have my bowel program done at or after 8:45 pm count – the time I have always done my bowel program in the RHU [and] general population.
> 2[.] to have (2) chucks pads; (2) surgilube; (2) bags (to dispose of the chucks); (5) gloves; [and] (1) fleets enema in my cell to do my bowel program.

Id,  Defendant Visinsky responded to the accommodation request noting that "Medical [i.e., the Medical Department] can make the item available but security [i.e, the Security Department of the RHU] rules on how they are distributed."  Id.  Plaintiff also filed an emergency grievance on January 13, 2008 to the Grievance Coordinator, Ms. Sroka, who received it on January 14, 2008 and responded to it that same date, indicating that she was referring the emergency grievance to Medical.  Dkt. [76-18] at 1.  Plaintiff complains that he never received an answer to that grievance.  Dkt. [123] at 19, ¶ 91.  Plaintiff also claims that Ms. Sroka sent the emergency grievance to Visinsky specifically on January 14, 2008.  However, there does not appear to be any evidence of record that Plaintiff pointed to which shows that Visinsky, rather than someone else in the Medical Department, ever saw this emergency grievance.  On January 14, 2008, Plaintiff was again offered the limited supplies in order to perform his bowel program but again refused, noting that he needed all of his medical supplies in order to properly perform his bowel program.  Dkt. [123] at 20, ¶ 92.  The same thing happened on January 15, 2008.  Id., at ¶ 93.  On January 15, 2008, Plaintiff sent request forms to Gates, Dkt. [76-20] and to Defendant Superintendent Rozum, Dkt. [76-21],  concerning the needed bowel program supplies.  It appears that Mr. Gates responded on January 16, 2008, indicating that "I have already instructed the RHU Lt. to advise all RHU staff [that] you are permitted to have in your possession the items/quantities listed above."  Dkt. [76-20].  It is not  clear when Defendant Rozum saw Plaintiff's January 15, 2008 request form but Defendant Rozum promptly replied to the request form on January 17, 2008, in pertinent part as follows: "I will forward a copy of this request form to Medical and the Major [of Security] for investigation of your claims."  Dkt. [76-21].  On January 17, 2003, Nurse Miller provided Plaintiff with the proper supplies, indicating that Defendant Gehlman had ordered that Plaintiff should be given them.  Dkt. [123] at 20, ¶ 96; Dkt.

[161] at 17, ¶ 2 ("Nurse Miller brought me my correct supplies on 17 Jan. 08 at approximately 11:00 A.M.").

Plaintiff alleges that the foregoing delay in receipt of the complete supplies for his bowel program violated the Eighth Amendment standards.

Contrary to Plaintiff's calculation that the Defendants caused a delay of 141 hours, Dkt. [123] at 21, ¶ 97, counting from Friday evening, the last time he did his bowel program, before entering the RHU, the delay actually was only from Sunday January 13, 2008 at 11:00 AM when Plaintiff first requested the complete supplies and did not get them until, January 17, 2008 at 11 A.M., a total of 96 hours in delay.   Thus, Plaintiff was delayed in doing his bowel program for 96 hours, not the 141 hours as he would have it.

Moreover, Plaintiff only does a bowel program every other day.  Dkt. [125] at 23 ("I do a bowel program every other day").  Thus, it is apparent that a delay in receipt of bowel program supplies of 48 hours does not constitute an Eighth Amendment violation in the context of this case.

The general rule is that "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in . . . harm." Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993); Sealock v. Colorado, 218 F.3d 1205, 1210 (10th Cir. 2000)("Delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in . . . harm."); Joseph ex. rel. Estate of Harbin v. City of Detroit, 289 F.Supp.2d 863, 869 (E.D. Mich. 2003)(in a case where defendants ignored complaints of chest pain for several hours but subsequently transported prisoner to the hospital where he died 12 hours later, the court held that "the Defendant City and its officers did not altogether deny medical treatment to Mr. Harbin, but instead delayed it for several hours.  In

order to show that this delay rose to the level of a constitutional violation, Plaintiff must 'place

verifying medical evidence in the record to establish the detrimental effect of the delay in

medical treatment.' Napier v. Madison County, 238 F.3d 739, 742 (6th Cir. 2001)").  This is the

rule in this Circuit.  See, e.g.,  Brooks v. Kyler, 204 F.3d 102, 105 n.4 (3d Cir.  2000) (the

prisoner-plaintiff " presented no evidence of any harm resulting from a delay in medical

treatment.").  Instantly, Plaintiff has failed to adduce any evidence of additional harm caused by

the delay of 96 hours in supplying his complete supplies.  Plaintiff does allege that he suffered a

prolapsed anus due to his partially successful attempt to perform his bowel program without all

of the necessary supplies, Dkt. [123] at 21, ¶ 97, however, Plaintiff is not a doctor and is not

competent to offer such a diagnosis as to what caused his prolapsed anus and/or bleeding from

the rectum, assuming he has/had such, given that there is no medical evidence pointed to by

Plaintiff of any such diagnosis.[4]  Hence, Plaintiff failed to adduce evidence of the objective prong

that this delay was an objectively serious deprivation resulting in harm so as to constitute cruel

---

[4] It is true that Plaintiff requested at one point in these proceedings that he be permitted to undergo an
Independent Medical Exam pursuant to Fed.R.Civ. P. 35, and pursuant to a Local Rule 35.1. Dkt. [95].
It is further true that the Court denied the request without prejudice to being refiled. Dkt. [102]. The
Court's earlier order was in error insofar as it denied Plaintiff's request without prejudice. In fact,
Fed.R.Civ.P. 35 does not authorize the Court to provide medical experts to civil litigants, even those that
are allegedly indigent, in order for them to meet their own burden of producing expert evidence. See,
e.g., Brown v. United States, 74 Fed.Appx. 611, 614 -15  (7th Cir. 2003) ("As the district court correctly
noted, Rule 35 of the FRCP does not vest the court with authority to appoint an expert to examine a party
wishing an examination of himself.  Rather, under appropriate circumstances, it would allow the court to
order a party to submit to a physical examination at the request of an opposing party.  Brown seeks to
compel the government to bear the cost of and responsibility for hiring an expert witness to testify on his
behalf in order to establish a fundamental element of his case.  However, no civil litigant, even an
indigent one, has a legal right to such aid.  The court's denial of Brown's motion for appointment of an
expert witness was therefore within its discretion.  Furthermore, because it deprived him of no right, the
denial did not result in a due process violation."); Smith v. Carroll, 602 F.Supp.2d 521, 526 (D.Del.
2009).  If Fed.R.Civ.P. 35 does not authorize the Court to expend United States Government funds to
assist litigants in obtaining medical experts in order to meet their burden, then Local Rule 35.1 could not
do so either.  Cf. International Longshoremen's Ass'n, Local Union 1332 v. International Longshoremen's
Association, 940 F.Supp. 779, 780 n.1 (E.D.Pa. 1996)("The standard of Local Rule 41.1(b) cannot go
beyond the standard of Rule 60(b), because Rule 60(b) takes precedence over Local Rule 41.1(b).").

and unusual punishment as was his burden.  This alone would defeat his Eighth Amendment claim based upon the delay, not only as to the DOC Defendants but also as to the Medical Defendants.  Hence, all Defendants are entitled to summary judgment as to Plaintiff's Eighth Amendment claim for delaying his bowel program.

In the alternative, even if he were to adduce such evidence of the objective prong, there is no evidence of the subjective prong.   As to Defendant Deputy Superintendent Gates, he wrote back to Plaintiff on January 16, 2008 indicating that  "I have already instructed the RHU Lt. to advise all RHU staff [that] you are permitted to have in your possession the items/quantities listed above."  Dkt. [76-20].  This simply does not evince the subjective prong of deliberate indifference and thus, Defendant Gates is entitled to summary judgment on this deliberate indifference claim.

As to Defendant Rozum, the only evidence adduced as to his knowledge, is the request written by Plaintiff on January 15, 2008, which Defendant Rozum responded to on January 17, 2008, wherein Defendant Rozum referred Plaintiff's complaints to be investigated by the security major Gehlman and by Medical. Moreover, we note that for all the evidence of record shows, Defendant Rozum did not see the request until January 17, 2008, the date of his response.  By January 17, 2008, Plaintiff had received all the supplies necessary so as to perform his bowel program.  That Plaintiff had received such supplies by the time Defendant Rozum apparently became aware of the situation and was able to do anything about it, affords yet another ground to grant summary judgment in favor of Defendant Rozum.

The rule is that knowledge of the conditions **after** they ceased to exist (or even shortly before they ceased to exist in situations where a plaintiff has not shown that the defendant could have taken any remedial action in such a short time frame) could not serve as a basis of liability.

One of the reasons for the requirement of contemporaneous knowledge[5] is so that the defendant has an opportunity to intervene such that the failure to do so may properly be said to have "caused" the deprivation since any actions or inactions that occur after the alleged deprivation of constitutional rights had already been completed cannot be said to have been the "cause" of Plaintiff's injuries.  Without such causation there can be no liability.  See, e.g., Troublefield v. City of Harrisburg, Bureau of Police, 789 F.Supp. 160, 166 (M.D. Pa. 1992) ("Brower v. Inyo County, 489 U.S. 593 (1989) . . . requires that some nature of volitional act on the part of the state actor must cause the harm to plaintiff for a fourth amendment excessive force claim to sound.").  See also Ricker v. Weston, 27 Fed.Appx. 113, 119 (3d Cir. 2002)("This decision not to discipline the officers does not amount to active involvement in appellees' injuries given that all of the injuries occurred before the decision.");  Moor v. Madison County Sheriff's Dept., 30 Fed.Appx. 417, 420 (6th Cir. 2002) ("Timing is everything. Cochran did not learn any of these facts until Moor filed her complaint. Specifically, Cochran first learned of the incident on May 27, 1999, when he received a letter from Moor's attorney along with a courtesy copy of the Complaint. After receiving the complaint, Cochran investigated the incident by questioning Arthur, who denied any wrongdoing, and he reviewed the 911 calls for assistance from the Shell station. . . .In fact, Moor's facts reveal that Cochran did not know of the incident [at the time of its occurrence] and therefore could not have implicitly acquiesced in it.");  Lanigan v. Village of

---

[5]  "A defendant in a [§ 1983] action must have personal involvement in the alleged wrongs."  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  "Personal involvement can be shown through allegations of personal direction or of actual [contemporaneous] knowledge and acquiescence."  Id. Accord Evancho v. Fischer, 423 F.3d 347, 353 (3d Cir. 2005) ("Her amended complaint likewise does not contain even a remote suggestion that Attorney General Fisher had **contemporaneous**, personal knowledge of her transfer and acquiesced in it.") (emphasis added).

East Hazel Crest, Ill., 110 F.3d 467, 478 (7th Cir. 1997) ("Chief Robertson could not have

undertaken any action to 'un-do' any alleged constitutional violation by Sergeant Krane.").

In like manner, there does not appear to be any competent evidence pointed to by

Plaintiff, which establishes that Defendant Gehlman had any personal knowledge of the delay in

providing Plaintiff his complete medical supplies in order to perform his bowel program, at least

not at a time during the period of delay, i.e., from January 13 to January 17.  See Dkt. [188-2] at

8,  ¶5  (Affidavit of Gehlman stating "I was not present in the restricted Housing Unit from

January 13, 2008 to January 17, 2008 . . . .").  Nor does Plaintiff otherwise point to any

competent evidence that Defendant Gehlman knew of the delay in supplying Plaintiff's complete

medical supplies.  See, e.g., Dkt. [159] at 18, ¶ 43.

The best Plaintiff comes up with to try to make these defendants liable to him is to point

to the fact of Defendant Visinsky's statement that whereas the medical department can make

medical supplies available it is security which determines how those medical supplies are

distributed.  Plaintiff contends that this evidences a policy on the part of DOC Defendants and

the Medical Defendants where security concerns always trump medical concerns.   While

Defendant Visinsky did state that medical can make supplies available but security determines

how those are distributed, the record taken as a whole establishes quite the contrary, given that

notwithstanding Lt. Doyka's security concerns, Plaintiff was ordered to be given all of his

medical supplies required to do the bowel program.  Hence, there is no evidence of an

unconstitutional policy where security concerns always trump medical concerns.  Nor does

Plaintiff's citation to the contract between PHS and DOC requiring that PHS observe all laws as

well as the rules and policies of DOC, establish an unconstitutional policy of security concerns

trumping medical concerns.  Moreover, given that security concerns are a legitimate penological

interest, that such legitimate concerns enter into the calculus of the provision of medical care is simply not unconstitutional so long as a prisoner is not deprived of the minimal civilized measure of life's necessities.  Cf.  Brightwell v. Lehman, No. Civ.A. 03-205J, 2006 WL 931702, at *8 (W.D. Pa. April 10, 2006) ("That cost is a factor in the provision of treatment outside the prison walls supports this conclusion [that disagreement over which drugs to administer simply does not demonstrate the deliberate indifference necessary to state an Eighth Amendment claim].  Resources are not infinite and reasonable allocation of those resources, taking into account cost, does not amount to deliberate indifference even if a prisoner does not receive the most costly treatments or his treatment of choice.").

As to Defendant Visinsky, there is no sufficient evidence of a subjective deliberate indifference to Plaintiff's serious medical needs.  Defendant Visinsky indicated that his only knowledge of the events of January 13 to 17, 2008 was solely from the accommodation requests and grievances to which Visinsky responded.  Dkt. [133] at 2, ¶ 10. Visinsky further established that he was not present in the RHU during this time.  Id., at 6, ¶ 45.  Nor has Plaintiff offered anything to counter the fact that Defendant Visinsky was not present in the RHU during this time.  Dkt. [159] at 18 to 19, ¶ 45.  However, given the accommodation request, as of January 14, 2008, Defendant Visinsky knew from such  request that Plaintiff wanted certain of his bowel supplies in the RHU and also wanted to perform his bowel program at a certain time.  It is possible that from this evidence, Defendant Visinsky was not aware of exactly which supplies Plaintiff was not being given because the accommodation request does not explicitly indicate which supplies Plaintiff was being denied.  Nevertheless, we construe this accommodation request, and the possible investigation performed by Visinsky engendered by the Plaintiff's accommodation request as providing the knowledge of which supplies Plaintiff was being

16

denied.  Even so, contrary to Plaintiff's contentions, Mr. Visinsky's response to Plaintiff's request, that medical authorities were able to make medical devices and supplies available but it was the province of the security authorities to determine how they are to be distributed,  Dkt. [76-17], simply does not establish the subjective prong on the part of Visinsky.

First, the record establishes that Plaintiff received some of his supplies in order to do his bowel program and Visinsky was aware of this.  Hence, for all the record shows Defendant Visinsky, could have reasonably concluded that even with the more limited supplies, Plaintiff could perform his bowel program.  See, e.g., Dkt. [125] at 15 (in response to a grievance Visinsky wrote "Bowel preps were offered to the grievant every day from 1/13/08 to 1/17/08, the grievant refused them.").  And indeed, there is evidence that Plaintiff did attempt to do his bowel program even without all of the supplies.  Dkt. [162] at 18 (noting Plaintiff used bare finger to try to extract feces); Dkt. [123] at 21, ¶ 97.  Hence, Plaintiff has not established that Defendant Visinsky "kn[e]w[] of and disregard[ed] an excessive risk to inmate health or safety" where the record would not permit a rational factfinder to conclude that Defendant Visinsky acted with deliberate indifference, where Defendant Visinsky could have reasonably concluded that Plaintiff was able to perform his bowel program with the more limited supplies he was given.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Even if Defendant Visinsky could not have reasonably concluded that Plaintiff could perform his bowel program with the more limited supplies, then, at most Defendant Visinsky made such a conclusion unreasonably, which is to say, Defendant Visinsky should have known that Plaintiff could not have performed his bowel program with the more limited supplies.  However such a "should have known" standard only amounts to negligence, see, e.g., Farmer v. Brennan, 511 U.S. at 860 (Thomas, J. concurring)("Petitioner's

suggested 'should have known' standard is nothing but a negligence standard"), which is not sufficient under Section 1983 to establish deliberate indifference.  Estelle, 429 U.S. at 105-06.

Indeed, the record taken in a light most favorable to Plaintiff establishes **at most** with respect to Visinsky mere negligence, i.e., Visinsky negligently concluded that Plaintiff could perform his bowel program even without all of the items Plaintiff was prescribed.  That Defendant Visinsky could so believe is corroborated by the fact that previously, Plaintiff complained that he was denied all of his supplies in order to do his bowel program in the RHU, namely rather than given three diapers (in lieu of 2 chucks pads) he was only given two diapers, and Plaintiff claimed he could not possibly perform his bowel program because with only two diapers, he would soil his bed linens. Dkt. [125] at 27 to 28.   Plaintiff even contended that, due to having only two rather than three diapers,  he did not perform his bowel program from August 14, 2007 to August 18, 2007, a period of four days, exactly the number of days of delay at issue presently.  He apparently could not perform the bowel program for fear of soiling his linens. Defendant Visinsky was aware of this prior time because he responded to Plaintiff's grievance concerning this prior time. Dkt. [125] at 29.  In light of the information of record before Visinsky concerning the period of January 13, to January 17, that Plaintiff received some of his bowel program supplies, and Plaintiff's prior complaints of impossibility to do his program with only two diapers, it was, at most, negligent for Defendant Visinsky to conclude that Plaintiff could perform his bowel program even with the limited supplies.  However, such negligence is insufficient.  Estelle, 429 U.S. at 105-06.  The subjective prong requires Plaintiff to show that Defendant Visinsky "possessed 'a sufficiently culpable state of mind in denying medical care' ... greater than mere negligence."  Miller v. Calhoun County, 408 F.3d 803, 813 (6th Cir. 2005).

18

Plaintiff has failed to do so here however.  Hence, Defendant Visinsky is entitled to summary judgment on this Eighth Amendment claim.

We turn next then to Defendant Doyka, who was the one defendant most directly responsible for the 96 hour delay in Plaintiff not receiving all of the supplies to do the bowel program.  The record establishes that as of July 22, 2007, Plaintiff was ordered by medical personnel to receive every other day the following: 2 chucks pads (to prevent soiling of bedding and the wheelchair), 2 surgilubes (lubricant to help digitally stimulate and withdraw the feces), one fleets enema, one red (bio-hazard garbage) bag, and five gloves.  Dkt. [76-11] at 1.  This order was for one year duration.  Id.  On Sunday, January 13, 2008, Lt. Doyka disallowed some of the items from being given to Plaintiff in the RHU due to heightened security concerns.  Dkt. [188-2] at 15, ¶ 6. This is so, even though in times past, Plaintiff asserts that when he was previously housed in the RHU, he was permitted to have all of these items.  Defendant Doyka apparently had no personal knowledge of what medical items Plaintiff was required to have while housed in the RHU.  Dkt. [133] at 5, ¶ 41; Dkt. [188-2] at 15, ¶5.  In contrast, Plaintiff contends that Lt. Doyka was made aware of what constituted his required bowel program supplies.  Dkt. [123] at 17, ¶ 81.  However, all of the evidence that Plaintiff points to in establishing this, fails to do so because none of the evidence he points to would indicate that Doyka, as opposed to others, was in fact aware of what supplies were absolutely necessary to perform the bowel program. See, e.g., Dkt. [125] at 21 - 22 (does not establish that Lt. Doyka was present in the RHU at the time of 8/16/07 to 10/14/07 or even if he were that he knew of what supplies Plaintiff was permitted to have); at 27 (Grievance to unnamed Shift Commander); at 45 (grievance); at 46 (grievance response by Visinsky).  Moreover, what these exhibits do establish is that in times that Plaintiff was previously in the RHU, he did have difficulties getting all of his bowel supplies.

Rather than be given all of the supplies listed above, Lt. Doyka only permitted Plaintiff to have one chucks pad, one glove, 1 fleets enema and that he had to give the nurse back the used fleets enema immediately.  Dkt. [161] at 15.  At most, what the summary judgment record establishes is that Lt. Doyka should have known that Plaintiff was entitled to have, even in the RHU, **all** of the supplies listed above in order to do Plaintiff's bowel program and that Lt. Doyka should have known that Plaintiff could not properly do his bowel program without all of the listed supplies, i.e., could not have properly done his bowel program with the more limited supplies Lt. Doyka permitted Plaintiff to have.  However, again, at most, this record establishes not deliberate indifference to a serious medical need but mere negligence.  As is clear, such a "should have known" standard is not the "deliberate indifference" standard required under the Eighth Amendment but is merely a negligence standard, and absolutely falling short of any constitutionally cognizable claim.  See e.g., Farmer v. Brennan, 511 U.S. at 860 (Thomas, J. concurring)("Petitioner's suggested 'should have known' standard is nothing but a negligence standard").  There is simply no evidence to establish that the Defendant Doyka was "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and [that he]  . . . also dr[e]w the inference."  Farmer v. Brennan, 511 U.S. at 837 (1994).  At most, the record establishes that a security minded RHU lieutenant, focused on security and perhaps reading the RHU regulations incorrectly, forbade Plaintiff for a period of 96 hours from receiving all of the supplies, but permitting Plaintiff some of the supplies, thinking that such were sufficient for Plaintiff to perform his bowel program. Given such a record, no reasonable juror could find the requisite subjective mindset as to Lt. Doyka.

In the alternative, even if we found that Plaintiff had adduced sufficient evidence of both the objective and subjective prong, as well as sufficient evidence of causation, the Court has no

20

hesitancy in concluding that Defendant Doyka would be entitled to summary judgment as to the Eighth Amendment claim because it would not have been clear to a reasonable official in the shoes of Lt. Doyka, that his actions violated clearly established law, given what Doyka actually knew or more precisely, what he did not know, and given the heightened security concerns in the RHU, and given that Doyka could have reasonably believed that Plaintiff was able to perform his bowel program with the more limited supplies.  In other words, there is no genuine issue of material fact that  Lt. Doyka would be entitled to qualified good faith immunity.

A "government official is entitled to qualified immunity if his 'conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" Berg v. County of Allegheny, 219 F.3d 261, 272 (3d Cir. 2000).  In "order to survive summary judgment on grounds of qualified immunity, a plaintiff must (1) allege violation of a valid legal right and (2) demonstrate that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  Abdullahi v. City of Madison, 423 F.3d 763, 775 (7th Cir. 2005) (quoting Saucier v. Katz, 533 U.S. 194, 201-02 (2001)).[6]

Although in the preceding analysis, the Court determined that the Defendants did not violate Plaintiff's constitutional rights (or more properly, there is no material factual dispute over this), even if, for the sake of argument, the court assumed such actions or inactions on the part of Defendant Doyka did violate Plaintiff's constitutional rights, he would still be entitled to summary judgment on the basis of qualified immunity because it would not have been clear to a reasonable officer that his actions violated Plaintiff's constitutional rights, in light of his good

---

[6]  Recently, the Supreme Court receded from the qualified immunity rule in Saucier v. Katz that required the courts to first determine whether a constitutional violation occurred and only then proceed to determine if it would have been clear to a reasonable person that their actions violated clearly established law.  Pearson v. Callahan, __ U.S. __, 129 S.Ct. 808 (Jan. 21, 2009).

faith attempt to balance what he reasonably, if mistakenly, believed to be security concerns in

providing Plaintiff more limited supplies, which more limited supplies he could have reasonably,

but again mistakenly, believed to be adequate for Plaintiff to perform his bowel program.  Thus,

in the alternative, Defendant Doyka would be entitled to summary judgment based on qualified

good faith immunity.

While Plaintiff had sought both injunctive relief and damages, because Plaintiff  long ago

was transferred out of the RHU,[7] any such claims for injunctive relief regarding the RHU and

supplying Plaintiff with all of the necessary supplies while in the RHU are moot.[8]  Hence, the

---

[7]  Dkt. [160] at 4 ("plaintiff is no longer in the RHU [and] is presently on AA unit.").

[8]  There is a narrow exception to the mootness doctrine, oftentimes referred to as the "capable of
repetition but evading review" exception.  The Plaintiff bears the burden of demonstrating that this
exception applies.  Incumaa v. Ozmint, 507 F.3d 281, 289 (4th Cir. 2007)("Incumaa bears the burden of
demonstrating that the exception applies . . . .").  Moreover what the court stated in Incumaa, applies
equally here.  In Incumaa, a prisoner plaintiff sought injunctive relief concerning conditions in an MSU,
a heightened security place, sufficiently akin to the RHU for present purposes to be persuasive herein.
The court therein rejected the injunctive relief claim, finding it moot because the prisoner plaintiff had
been transferred out of the MSU by the time the court came to rule on his injunctive relief claims.  The
court held that

> In the absence of a class action, jurisdiction on the basis that a dispute is "capable of
> repetition, yet evading review" is limited to the "exceptional situation[ ]," Los Angeles v.
> Lyons, 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), in which "(1) the
> challenged action is in its duration too short to be fully litigated prior to cessation or
> expiration, and (2) there is a reasonable expectation that the same complaining party will
> be subject to the same action again," Spencer v. Kemna, 523 U.S. 1, 17, 118 S.Ct. 978,
> 140 L.Ed.2d 43 (1998) (internal quotation marks and alteration omitted). Incumaa bears
> the burden of demonstrating that the exception applies, see, e.g., Brooks v. Vassar, 462
> F.3d 341, 348 (4th Cir. 2006), and in this instance, it is a burden that he cannot carry.
> Unless we are to assume that Incumaa will flout SCDC standards and codes of conduct
> in such a manner as to warrant reassignment to the MSU, there is nothing in the record to
> support the proposition that he is likely to be subjected to the MSU publications ban
> again in the future. There is no evidence in the record that the SCDC arbitrarily places
> inmates in the MSU. Instead, assignment to the MSU is directly tied to an inmate's bad
> behavior, so Incumaa thus "holds the keys" to his remaining free from the unit.
>     For us to find the exception for cases "capable of repetition, yet evading review"
> applicable here, then, we would have to forecast bad behavior on Incumaa's part. We
> surely cannot base our mootness jurisprudence in this context on the likelihood that an

qualified immunity defense would render summary judgment proper and would completely

dispose of the Eighth Amendment claim  as against Defendant Doyka given that only money

damage claims now remain and qualified immunity is a complete defense to such money damage

claims.  Tubbesing v. Arnold, 742 F.2d 401, 403 (8th Cir. 1984) ("Since only money damages

were sought in Evans, supra, qualified immunity was a complete defense to the plaintiff's claims

and prevented the defendants from being put to trial.").

        Since, Defendant Doyka would be entitled to qualified immunity and he was the one

Defendant most intimately and directly involved in delaying Plaintiff's receipt of all of the

supplies for the bowel program, a fortiori, those who were less directly involved, would likewise

be entitled to qualified immunity for their roles in the delay of the medical supplies, because it

would have been even less clear to them that their actions in responding to Plaintiff's grievances

and/or accommodation requests violated Plaintiff's constitutional/statutory rights.  Hence, all of

the DOC defendants are entitled to summary judgment based on qualified immunity.  This same

reasoning would apply to the Medical Defendants, given that their roles were minimal to non-

existent and that they apparently had no contemporaneous knowledge of the events transpiring

from January 13 through 17, and hence, they are entitled to qualified immunity as well.

---

        inmate will fail to follow prison rules. Such "conjecture as to the likelihood of repetition
        has no place in the application of this exceptional and narrow grant of judicial power" to
        hear cases for which there is in fact a reasonable expectation of repetition. Abdul-Akbar,
        4 F.3d at 207. There must be a "demonstrated probability" that the challenged action will
        recur again, and to the same complainant. Murphy v. Hunt, 455 U.S. 478, 483, 102 S.Ct.
        1181, 71 L.Ed.2d 353 (1982) (per curiam). Because Incumaa will only find himself in the
        MSU again if he bucks prison policy, and because we presume that he will abide by
        those policies, we conclude that the "capable of repetition, yet evading review"
        exception to mootness does not apply in this case. See Slade v. Hampton Roads Reg'l
        Jail, 407 F.3d 243, 249 (4th Cir. 2005) (presuming, in deciding a mootness question, that
        individuals will abide by the law in the future).

Incumaa, 507 F.3d at  289.

In addition, the Medical Defendants would be entitled to summary judgment based upon Plaintiff's lack of evidence of the subjective prong as to the delay in bowel program supplies. Dr. McGrath attested that "[s]upplies for Mr. Evans' bowel program were ordered for him regularly and I had no reason to believe that he was not receiving them."  Dkt. [172] at 4, ¶ 36. There is no evidence that they had any knowledge between January 13, 2008 and January 17, 2008, that Plaintiff was being denied his complete bowel supplies.  All the evidence Plaintiff points to is lacking.  Dkt. [169] at 14.  For example, Plaintiff cites to Exhibit 11, Dkt. [76-11] at 1, which is merely the medical order directing which supplies Plaintiff needs for his bowel movement, an order signed off on by Dr. McGrath.  Exhibit 16, is an entry in a progress note written by Nurse Benford, on Sunday, January 13, 2008, at 11:30 AM, indicating that security disapproved some of the bowel supplies.  There is no evidence of when or if Dr. McGrath saw this notation.  The same can be said of Exhibits 17 (an accommodation request to Visinsky); 18 (emergency grievance responded to by Ms. Sroka who noted on January 14, 2008, "I will forward to Medical"); Exhibit 19 (refusal of medical treatment form dated January 15, 2008); Exhibit 20 ( request to Staff directed to Deputy Gates, dated January 15, by Plaintiff and responded to by Gates on January 16, 2008, indicating that Gates directed the RHU lieutenant to instruct all RHU staff that Plaintiff is permitted all the supplies); Exhibit 21 (request to staff directed at Superintendent Rozum, dated January 15, 2008 by Plaintiff and responded to by Rozum on 1/17/08 indicating that Rozum will forward a copy to "Medical and the Major" with a notation of "cc" to Visinsky and Major.  Plaintiff also cited to Exhibits 31 (grievance dated March 7, 2008); 32 -33 (grievance response and appeal response both dated in March 2008), 37 (medical progress notes dated from 6/24/07 to 9/14/07); Exhibits 38 and 39 (admission by Dr. McGrath to interrogatory that the medical notes of June 24, 2007 indicate essentially that Plaintiff could

continue treatment including bowel program in RHU and an admission that Plaintiff was given his bowel prep supplies when he was in the RHU from 8/16/07 to 10/14/07).[9]  The Court could go on but suffice it to say, none of the evidence that Plaintiff points to supports a contemporaneous knowledge on the part of Dr. McGrath that from January 13, 2008 to January 17, 2008, Plaintiff was being denied the complete supplies needed to do his bowel program and so there is no evidence of the subjective prong as to Dr. McGrath.

The best Plaintiff can come up with is where he does say in his brief in opposition to the Medical Defendants' summary judgment motion that "Dr. McGrath was aware of this denial [of the entire bowel supplies from January 13, 2008 to January 17, 2008] due to a request form I sent him. . . . (See Plaintiffs Concise Statement and Declaration, para 60 to 107, doc 124 [and] 123 respectively.)"  Dkt. [169] at 4, ¶ 8.  Although Plaintiff cites to his "Concise Statement [of Facts] and Declaration para 60 to 107,", which the Court takes to be Dkt. [123] at 12 to 23, and/or Dkt. [124] at 12 to 23,  nowhere in paragraphs 60 to 107 of either of those documents does Plaintiff say that he filed a request form to Dr. McGrath during January 13, 2008 to January 17, 2008. This absence is striking given that Plaintiff does clearly state "That plaintiff on 1-15-08 did send request forms to Gates  [and] Rozum concerning the denial of my bowel program as described above."  Dkt. [123] at 20, ¶ 94.  Plaintiff then cites to those request forms in the evidentiary materials, which are at Dkt. Nos. [76-20] & [76-21].  Thus, although Plaintiff states that he filed a request form to Dr. McGrath and he made such a statement under penalty of perjury, see Dkt.

---

[9]  Although Dr. McGrath admits that from August 16, 2007 to October 14, 2007, Plaintiff was given "his bowel program supplies as ordered in his medical records" Dkt. [125] at 21, ¶ 37, in fact, other evidence Plaintiff himself provided points to the fact that he apparently was not given all of the supplies he deemed necessary to do his bowel program in the RHU in August 2007.  See, e.g., Dkt. [125] at 27 ("Emergency Grievance" complaining that Plaintiff did not receive all of the supplies he needed to do his bowel program).

Nos. [123] at 37; [124] at 27, Plaintiff's mere statement that he did so is not sufficient to create a genuine issue of material fact because the rule is that where one references a written document, it must be attached to the affidavit.  See, e.g., Madden v. Nat. Center for Missing and Exploited Children, 182 F.3d 913 (Table), 1999 WL 422950, at *4 (5th Cir. 1999)(unpublished opinion) ("Federal Rule of Civil Procedure 56(e) provides that '[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith' 'This means that if written documents are relied upon they actually must be exhibited; affidavits that purport to describe a document's substance or an interpretation of its contents are insufficient.' 10A Charles Alan Wright et al., Federal Practice & Procedure § 2722, at 380-81 (1998)"); Financial Services of America, L.L.C. v. EGL-Eagle Global Logistics, L., No. 04-2497-CM, 2007 WL 2402636, at *2 (D.Kan. Aug. 17, 2007) ("Here, plaintiff has not complied with Rule 56(e) because it has not submitted a copy of the letter sent to defendant EGL. The court will disregard the portion of Mr. Wilson's affidavit stating that the letter was sent specifically to defendant EGL.").  See also  Albrigt v. Virtue, 273 F.3d 564, 574-75 (3d Cir. 2001)("We are mindful that documents merely referred to in these affidavits, but which were not attached to such affidavits, cannot be considered either by the District Court or by this court. Pursuant to Rule 56(e), '[s]worn or certified copies of all papers or parts thereof referred to in an affidavit *shall* be attached thereto or served therewith.'") (emphasis added by the Albright Court).   Hence, Plaintiff's bald statement that he sent a request slip to Dr. McGrath (without noting when he did so) and without attaching such request slip to his evidentiary materials, fails to create a genuine issue of fact because it cannot be considered.

Nor, as explained above, does the provision in the contract between PHS and DOC that PHS would abide by all laws and rules of DOC provide the requisite subjective prong so as to

satisfy Plaintiff's burden.  Hence,  summary judgment should be granted to both the DOC

Defendants and the Medical Defendants as to Plaintiff's Eighth Amendment claim based upon

the delay of bowel program supplies.

Plaintiff makes a second set of Eighth Amendment claims.  This second set of claims

alleges that he needed (1) a catheter leg strap; (2) an AFO foot brace for his right leg; (3) an

eggcrate mattress; (4) gloves, either full fingered leather gloves (which Plaintiff wanted) or cloth

gloves (which Plaintiff was permitted to have); and (5) alternative soap to bathe with, and that he

was either denied these items or that these items were delayed in being provided to him.[10]

The summary judgment record reveals the following.  Plaintiff arrived at SCI-Somerset

on August 2, 2006.  On August 12, 2006, Plaintiff made a request for, *inter alia*, an eggcrate

mattress, an AFO, and a catheter leg strap.  Dkt. [76-9] at 1.  On August 22, 2006, Dr. McGrath

ordered that Plaintiff receive a catheter leg strap, an AFO for the right leg, and Dr. McGrath

made the duration of these orders for one year.  Dkt. [76-10] at 1.  Plaintiff also alleged that Dr.

McGrath told Plaintiff that he had approved Plaintiff for an eggcrate mattress but that the

procedures for obtaining one had changed and that Dr. McGrath would have to check into the

new procedures.  Dkt. [123] at 4, ¶ 16.  Nothing  relating to the eggcrate mattress was recorded in

the August 22, 2006 entry on Plaintiff's medical progress notes.  On October 11, 2007, more than

one year later, Dr. McGrath wrote in Plaintiff's medical records that the eggcrate mattress was

not medically necessary at this time.  In addition, Plaintiff was not casted for the Right AFO foot

---

[10]  The DOC Defendants read the operative complaint to be making out an Eighth Amendment claim
based upon Plaintiff's allegation that he is being denied the return of his personal wheelchair.  Dkt. [132]
at 10 to 11.  To the extent that he is attempting to make out such a claim, it may be summarily dismissed
given that there is no dispute that he has had use of a wheelchair at all times since his most recent
incarceration, whether it be his personal wheelchair or a loaner wheelchair (as Plaintiff claims) is of no
significance to the Eighth Amendment analysis.

brace until October 31, 2007.   On November 2, 2007, Dr. McGrath met with Plaintiff and told

Plaintiff that although he had approved Plaintiff for an eggcrate mattress, DOC was confiscating

such mattresses as a potential source of staph infections, given their inability to be readily

cleaned.  On November 2, 2007, Dr. McGrath recorded that Plaintiff wanted an eggcrate mattress

and Dr. McGrath informed Plaintiff in essence that the eggcrate mattress is a potential source of

infection and therefore, Plaintiff could not have one but that he can get an extra regular mattress.

Dkt. [76-16].  Without trying the extra mattress, Plaintiff told Dr. McGrath that the extra mattress

would not alleviate his back pain nor prevent pressure sores and so Plaintiff refused the extra

mattress.

As to the eggcrate mattress, it is clear that Dr. McGrath's medical opinion was that an

eggcrate mattress was not medically necessary and that a second standard mattress was sufficient

to meet Plaintiff's needs.  Plaintiff's disagreement with Dr. McGrath's medical opinion and his

refusal to even try the second mattress does not establish deliberate indifference but at most

medical negligence especially given the counter balance considerations that an eggcrate mattress

poses some risk of infection.  This is true, notwithstanding Petitioner's citation to DOC policy

regarding eggcrate mattresses, where such eggcrate mattresses apparently are permitted but only

in specified limited conditions and areas.  Plaintiff does not provide any evidence that he comes

within these limited conditions/areas.[11]  Hence, Dr. McGrath is entitled to summary judgment as

---

[11]  DOC policy with respect to eggcrate mattresses is as follows:

**G. Procedures for Egg Crate Mattresses**
1. Egg crate mattresses shall only be provided upon prescription by a physician for the
following reasons:
      a. alleviation and/or prevention of pressure sores on inmate patients
      whose condition requires confinement to bed for prolonged periods of
      time; and
      b. any other reason or circumstances as documented by a physician on

to this claim.  This is so, notwithstanding that Plaintiff attempts to portray the record as

indicating that Dr. McGrath at one time approved the eggcrate mattress but then changed his

mind.  A change in medical opinion does not establish a deliberately indifferent mindset

especially, where, as is true with so many medical decisions, there were countervailing

considerations, such as the risk of infection from the eggcrate mattress and where Plaintiff was

offered by Dr. McGrath a second regular mattress.  No reasonable juror on this record could find

for Plaintiff as to this Eighth Amendment claim.  This is true even if, as Plaintiff contends, there

were special newer types of eggcrate mattresses that address the risk of infection concern.  Dkt.

[136-6] at 11.  At most, prescribing two regular mattresses for Plaintiff rather than any such new

type of eggcrate mattress, would amount to negligence on the part of Dr. McGrath, if indeed, it

would even amount to negligence.

Similarly, PHS is entitled to summary judgment as to this claim because there is no

evidence that Plaintiff was subjected to an objectively serious deprivation where Dr. McGrath

determined that Plaintiff did not have a medical need for the eggcrate mattress especially in light

of its potential for causing an infection.  Nor is there evidence of the subjective prong as to PHS.

Given Dr. McGrath's medical opinion that eggcrate mattresses were not medically

necessary, the DOC Defendants are entitled to summary judgment as to this Eighth Amendment

---

the DC-472 in the inmate's medical record.
2. The use of this equipment shall be restricted solely to the infirmary inpatient care area
or to a Long Term Medical Care Unit.

3. Because this item cannot be effectively disinfected, its use shall be confined to a
single patient and discarded when the patient no longer requires it; or if it becomes
deteriorated and/or contaminated.

Policy Statement 13.2.1, Access to Health Care Procedures Manual, Section 10.G.  Dkt. [161] at 8 to 9.
Plaintiff adduced no evidence that he falls into the specified categories of an infirmary patient or
is housed in a Long Term Medical Care Unit within the meaning of this policy.

claim as well.  The general rule is that where a prisoner is being treated by medical personnel, non-physician prison officials cannot be deliberately indifferent for failing to intervene in the medical treatment.  See, e.g., Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993) ("The only allegation against either of these two [prison official] defendants was that they failed to respond to letters Durmer sent to them explaining his predicament.  Neither of these defendants, however, is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.")(footnoted omitted);  Thomas v. Zinkel, 155 F.Supp.2d 408, 413 (E.D. Pa. 2001)("Prison authorities who are not physicians cannot be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.  Similarly, health care administrators cannot be found deliberately indifferent when an inmate is receiving care from a doctor.")(internal citations and quotations omitted).  This rule makes sense because a non-physician layperson cannot be deliberately indifferent to a prisoner's medical needs when he knows that the prisoner is being seen by and treated by physicians and/or receiving treatment ordered by a physician, notwithstanding the prisoner's complaints about the physician's treatments and/or alleged mis-diagnosis because a non-physician layperson has no expertise whereby to judge the adequacy *vel non* of a physician's treatment.

The Court of Appeals did explain the above general Durmer rule is not an absolute rule.

In Spruill, the Court held that

> absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official like Gooler will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).

30

Here, there is no evidence that the DOC Defendants had reason to believe or actual knowledge that Dr. McGrath was mistreating Plaintiff when it came to the eggcrate mattress, especially since Plaintiff had been offered a second regular mattress and for all the record shows, the DOC Defendants could reasonably have believed this was sufficient.  It is true that Plaintiff filed grievances, which may have provided knowledge to those DOC Defendants that Plaintiff was dissatisfied with the medical orders of Dr. McGrath and even that Dr. McGrath had approved Plaintiff for an eggcrate type of seat cushion for his wheelchair in August 2006, Dkt. [188-3] at 14, but more is needed than this, otherwise every time a prisoner complains about his treatment, such would be sufficient to render the non medical personnel liable.  But the Eighth Amendment requires the showing of a subjective prong, i.e., deliberate indifference.  Here, for all the record shows, the DOC Defendants in response to the grievances performed their investigation, and simply found that Dr. McGrath's medical judgment to be more credible and persuasive as to what Plaintiff medically needed than that of Plaintiff's opinion or judgment as to what Plaintiff needed medically.  Giving credence to a medical doctor's opinion over that of a lay prisoner's opinion, simply does not demonstrate the kind of subjective mindset necessary to make out an Eighth Amendment claim.  The investigation prompted by Plaintiff's grievance did not appear to provide a reason to the DOC Defendants to know that Dr. McGrath was mistreating Plaintiff.  This is especially true when the DOC Bureau of Health Care Services, part of the Department of Corrections, which is comprised of physicians and nurses who, when requested, review medical care provided to inmates, repeatedly found no evidence of neglect or medical mistreatment of Plaintiff.  See Dkt. [135] at 7, ¶ 44 and n.5 (explaining the Bureau of Health Care Services); Dkt. [136-4] at 16 (review concerning soap allegedly causing skin problems and delay of bowel supplies in January 2008); id., at 40 (review of accommodation requests as

handled by SCI-Somerset); Dkt. [136-6] at 8 (review of eggcrate mattress issue as well as catheter strap).   This is true notwithstanding Plaintiff's conclusory claim that the Bureau of Health Care Services is not independent in its judgment.   See, e.g., Dkt. [160] at 16, ¶ 44 (calling the Bureau of Health Care Services a "rubber stamp" because in over 80 grievances that he filed not once did they overturn a decision).   The Court notes that Plaintiff's over eighty grievances may not be typical of the grievances that they review and that absent evidence of how they treated other prisoner grievances he has not carried his burden to show that the Bureau of  Health Care Services is simply a rubber stamp.   The low number of reversals may also simply be evidence that by the time the grievance reaches the Bureau, all or most of the meritorious grievances  have been resolved.   A low number of reversals no more reflects that the Bureau is a rubber stamp than does the relatively low number of grants of habeas relief in federal court of state court convictions.   This simply reflects that by the time petitioners get to federal court most of the meritorious claims have been remedied.

The same can be said of Plaintiff's claimed need for full fingered leather gloves for his wheelchair use.   Dr. McGrath opined that "Leather gloves are never a medical necessity for an inmate."   Dkt. [172] at 2, ¶ 14.   In response to the grievance appeal Plaintiff filed concerning this issue, Defendant Rozum noted that "[t]he Grievance Officer was advised by the Medical Director [i.e., Dr. McGrath] that there is no medical requirement for the gloves."   Dkt. [188-4] at 11.   The summary judgment record indicates the medical opinion was that Plaintiff need not have full fingered leather gloves because they were not medically necessary and in addition, they were a security risk.   Dkt. [188-4] at 9 (first level grievance response: "As you know leather gloves cannot be issued due to security concerns. You will be issued the brown cloth ones.").   See also Dkt. [188-4] at 13 (grievance response after Superintendent Rozum remanded the initial

32

grievance after Plaintiff appealed: "this Grievance Officer concurs with the original grievance response that leather gloves are not medically necessary, and present a security risk. The inmate will continue to be permitted to purchase cloth gloves for use in pushing his wheelchair."). Hence, there is no evidence on this record to prove the subjective mindset required for an Eighth Amendment claim.

Plaintiff does claim that he was never provided even the brown cloth gloves and that he was indigent and could not afford to purchase them. The Court notes that there is no evidence of the DOC Defendants' awareness that either he was not able to purchase the gloves due to his alleged indigence (given that in April 2007, Plaintiff received $100.00 in his prison account and $20.00 in June 2007and as late as August 2007 had a positive balance of $ 2.07 in his account and that such gloves cost only $0.99, Dkt. [64-11] at 1; Dkt. [136-4] at 13, and he could have purchased such gloves then in anticipation of bad weather, even if later in October 2007, when he made the request for gloves, his account had a negative balance).[12]    This is especially so when Plaintiff was observed with such a pair of cloth gloves in the Medical Department on October 18, 2007, which demonstrates that Plaintiff had some means to obtain the gloves. This is true even if it meant borrowing them from other inmates, something apparently not permitted by DOC regulations. Dkt. [136-4]. Moroever, there is no evidence as to how often, if ever, Plaintiff must travel outside and be exposed to weather conditions.

We turn next to Plaintiff's complaints of the "green soap" he was provided by DOC to wash himself with. Plaintiff complains that the soap was toxic and caused his skin to dry and crack and to cause lines to form on his skin and to destroy his finger and palm prints. Dkt. [123]

---

[12] The Court takes judicial notice of the case of Evans v. Philadelphia, No. 07-cv-3992 (Dkt. 4, which is Plaintiff's inmate account statement for the relevant period).

at 10 to11, ¶ 50.  Plaintiff noted that he saw Dr. McGrath on November 2, 2007, who listening to

Plaintiff's complaints stated that "that's nothing but dry skin."  Dkt. [123] at 6.  Plaintiff

complains that Dr. McGrath did so from five feet away sitting at his desk.  Id.  Apparently,

Plaintiff is complaining that Dr. McGrath did not adequately examine him to make the

determination that Plaintiff was suffering from nothing more than dry skin.  Again on January 17,

2008,  Plaintiff complained about the soap and stated "if you don't treat my dry skin, this is now

a lawsuit."  Dkt. [136-2] at 12 (medical record).[13]   The Physician Assistant notes that in the

objective portion of the progress note "WNL [which the court takes to be "within normal limits"]

skin.  No excretion, ery[thema, i.e, redness of the skin], edema, flaking, no pressure sores seen on

hips."  Id.  Plaintiff also complained on April 22, 2008 about the soap and a different Physician

Assistant wrote in the progress note: "Also c/o [i.e., complains of] allergic skin rxn [i.e.,

reaction] to green soap."  Dkt. [136-2] at 11.  Physician Assistant McAllister went to Plaintiff's

cell, and noted that no skin problems were seen.  Dkt. [136-2] at 11 ("no skin rash/ [illegible]

seen.").

     Moreover, Dr. McGrath attested as follows with respect to the green soap:

> 16.  The green soap about which Mr. Evans has complained is the standard
> soap used at SCI-Somerset and each of the other institutions that I oversee.
> 17.  Other soaps were available for purchase by Mr. Evans in the
> commissary.
> 18.  In my review of the medical records, there was never an indication
> that Mr. Evans had a skin rash or any type of reaction as a result of the soap.

---

[13]  While Plaintiff sought to challenge the validity of these medical records for lack of accompanying
affidavit of the records' custodian, see, e.g., Dkt. Nos. [156] and [157] , the Court denied the motion
seeking to have these medical records stricken.  Dkt. [181] at 5 ("As concerns the medical records, we
note again that Plaintiff himself has submitted these very same documents in various pleadings and,
hence, has no legitimate argument as to their authenticity and admissibility.").  Moreover, generally the
deficiencies were ultimately corrected after Plaintiff's challenges to the affidavits and exhibits.

19.  Physical examinations conducted by two different physician's
assistants on January 17, 2008 and April 22, 2008 were normal with no skin rash
seen.

Dkt. [172] at 2 to 3.  On this record, no reasonable jury could find that the Medical Defendants

were deliberately indifferent to Plaintiff with respect to his use of the green soap.  This is true

even taking as true that the examinations of Plaintiff were cursory or perfunctory, for such is

insufficient to establish an Eighth Amendment claim.  See Unterberg v. Correctional Medical

Systems, Inc., 799 F.Supp. 490 (E.D. Pa. 1992).  In Unterberg, a plaintiff-prisoner claimed that

the treatment she received was perfunctory and, therefore, constituted an Eighth Amendment

violation.  Id. at 495.  In rejecting this claim, the Court concluded that perfunctory treatment,

although it might constitute medical malpractice, does not amount to a constitutional violation.

The court noted that

> [i]n Hampton [v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976)], the
> Third Circuit made clear that medical malpractice alone will not give rise to an
> Eighth Amendment claim.  Hampton specifically states:
>
> > to establish a constitutional violation, the indifference must be
> > deliberate and the actions intentional....  Neglect, carelessness or
> > malpractice is more properly the subject of a tort action in the state
> > courts.

Id. at 497.  In the instant case, at most, Plaintiff's complaint and evidence establishes perfunctory

examinations which amount to no more than a claim of medical malpractice or negligence and

not deliberate indifference.  Hence, summary judgment should be granted to the Medical

Defendants.

Similarly, the DOC Defendants are entitled to summary judgment as to the green soap

issue because in response to the grievances filed, their reliance upon the medical experts' opinion

that Plaintiff had no skin condition was entirely reasonable and demonstrates that the DOC

Defendants lacked the subjective component of an Eighth Amendment claim.  This is true

35

notwithstanding Plaintiff's complaints about the soap for the same reasons as noted earlier.  The DOC Defendants, in response to the grievances, performed their investigation and simply found Dr. McGrath's medical judgment to be more credible and persuasive as to what Plaintiff medically needed than Plaintiff's opinion or judgment.  Giving credence to a medical provider's opinion over that of a lay prisoner's opinion simply does not demonstrate the kind of subjective mindset necessary to make out an Eighth Amendment claim because for all the record shows, the DOC Defendants did not credit Plaintiff's contention that the medical providers did not examine him properly in order to come to the conclusion that he suffered no harm from the green soap.  Hence, the investigation prompted by Plaintiff's grievance did not appear to provide a reason to the DOC Defendants to know that the medical providers were mistreating Plaintiff.

We turn next to the alleged delay in Plaintiff receiving his AFO foot brace and his Catheter leg strap.  Dr. McGrath offered an affidavit indicating that on August 22, 2006, he had ordered Plaintiff a catheter leg strap and that the order was good for one year duration.  Dr. McGrath further noted that he had no reason to believe that Mr. Evans did not receive the leg strap as ordered given that the provision of catheter leg straps is not tracked in the medical record, and that neither he nor PHS is involved with the provision of actual medical supplies as the provision of such medical supplies is DOC driven.  Furthermore, Dr. McGrath attested that a catheter leg strap holds the catheter close to the leg and the lack of one in no way damages a patient's urinary tract and that Plaintiff does not have any known damage to his urinary tract.  Dkt. [172] at 3, ¶¶ 25-29.

In the face of this evidence, Plaintiff cannot meet his burden because he has not shown either that Dr. McGrath possessed the requisite subjective mindset to satisfy the subjective prong, nor has Plaintiff adduced expert evidence that the delay in providing him a legstrap caused him

any additional harm.  While he claims such harm, he is not competent to provide such a medical opinion as to causation and/or as to a diagnosis.  Accordingly, the Medical Defendants are entitled to summary judgment on this claim.

In addition, the DOC Defendants are likewise entitled to summary judgment on this claim, given the lack of evidence as to the objective prong.  Moreover, they would be entitled to summary judgment based upon their apparent belief, like that of Dr. McGrath, that Plaintiff was in fact receiving a catheter leg strap.  See, e.g., Dkt. [188-3] at 15 (Grievance Response after remand).  In response to remanded grievance, the  grievance officer indicated that "An order for an AFO was written on Oct. 11, 2007.  An order for a catheter and leg strap was also written on the same date.  Nursing has been advised to make sure the grievant receives them both [i.e., a catheter and a catheter leg strap] when he receives a leg-bag catheter.  The leg-bag catheter comes with the strap inside the bag.  The other type of catheter [apparently, an overnight one] does not include a leg strap."  Dkt. [188-3] at 15 (grievance response dated 11/5/07).  On November 6, 2007, Plaintiff filed an appeal to the Superintendent from the November 5, 2007 grievance response.  In that appeal, Plaintiff apparently complained that the catheter leg strap he was requesting was something other than the catheter leg strap referred to in the November 5, 2007 grievance response, even though it was not clear that Plaintiff was complaining that there was another catheter leg strap he wanted, which was apparently not included inside the bag as indicated in the grievance response.  Dkt. [188-3] at 18.  Defendant Superintendent Rozum responded to the appeal on November 9, 2007, writing that he upholds the initial response from the grievance officer that was dated November 5, 2007, and that the "Superintendent finds that the issue of the catheter has been addressed."  Dkt. [170-8] at 1.

On this record, no reasonable juror could find the subjective prong of the Eighth Amendment claim met given that the DOC Defendants could have reasonably concluded Plaintiff in fact had received a catheter leg strap even if it was not the exact catheter leg strap that he wanted.  Accordingly, both the DOC Defendants and the Medical Defendants are entitled to summary judgment as to the catheter leg strap claim.  Alternatively, all Defendants would be entitled to summary judgment on this claim based on qualified good faith immunity insofar as they apparently reasonably believed Plaintiff possessed catheter leg straps sufficient to meet his needs even if he did not have the type of one he wanted.

Next we take up the AFO claim.  Dr. McGrath attested that on August 22, 2006, he ordered an AFO for Plaintiff's right leg, which is a brace that is worn on the bottom of the patient's foot and extends up the calf.  Dr. McGrath further attested that an AFO brace does not stop or prevent foot drop which is commonly seen in paraplegics and on October 11, 2007, Dr. McGrath ordered the **continued** use of a AFO brace for Mr. Evans, "meaning that he had been wearing an AFO." Dkt. [172] at 4, ¶ 39.   Finally, Dr. McGrath attested that Mr. Evans' right foot did not sustain any deformity or exacerbation of deformity while he waited for a new AFO brace." Id., at 5, ¶ 43.  Plaintiff claims however that he was without a AFO brace from August 22, 2006 until December 19, 2007 over a year later.  For present purposes we credit Plaintiff's contention that he was in fact without the AFO brace but note that Plaintiff utterly fails to adduce evidence that Dr. McGrath actually believed and/or knew that Plaintiff was without the AFO brace given that Dr. McGrath ordered on October 11, 2007 **continued** use of the brace, thereby indicating that Dr. McGrath believed that Plaintiff possessed and was using such a brace.  Hence, there is no evidence of the subjective prong necessary to make out an Eighth Amendment claim.  Moreover, it appears that the earliest Plaintiff formally complained of the lack of an AFO is July

38

26, 2007 when he put in an accommodation request to Mr. Visinsky, requesting such.  See Dkt.

[67].  It does not appear that Dr. McGrath ever became aware that Plaintiff was without his AFO

or was claiming to be without his AFO, until perhaps after the initiation of his lawsuit.  Hence,

there is a lack of evidence as to the subjective prong of the Eighth Amendment as to the Medical

Defendants.

Also, there is a lack of evidence of the objective prong for an Eighth Amendment

violation concerning the delay in obtaining an AFO for Plaintiff.  In light of the medical evidence

offered by Dr. McGrath that Plaintiff suffered no injury from the delay, Plaintiff cannot meet his

burden of "plac[ing] verifying medical evidence in the record to establish the detrimental effect

of the delay in medical treatment."  Napier v. Madison County, 238 F.3d 739, 742 (6th Cir. 2001).

See also  Brooks v. Kyler, 204 F.3d 102, 105 n.4 (3d Cir.  2000) (the prisoner-plaintiff "

presented no evidence of any harm resulting from a delay in medical treatment.").  While

Plaintiff contends that his foot suffered a deformity as a result of the lack of an AFO, again, he is

not a physician and not competent to give such an opinion.  Accordingly, both the Medical

Defendants and the DOC Defendants are entitled to summary judgment on the AFO brace claim

given the lack of evidence as to the objective prong.

### B.  First Amendment Retaliation Claims

In order to prevail on a First Amendment retaliation claim, a plaintiff must prove:  (1)

that he engaged in constitutionally protected activity; (2) that he was subject to adverse actions[14]

by a state actor; and (3) the constitutionally protected activity was a substantial motivating factor

in the state actor's decision to take adverse action.  Anderson v. Davila, 125 F.3d 148, 161 (3d

---

[14]  In order to prove an "adverse action," a prisoner must prove that "the action 'was sufficient to deter a
person of ordinary firmness from exercising his [constitutional] rights.'"  Rauser v. Horn, 241 F.3d 330,
333 (3d Cir. 2001).

Cir. 1997) (citing, Mt. Health City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1997)).  If the plaintiff proves these elements, the burden shifts to the state actor to prove that it would have taken the same action without the unconstitutional factors.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. at 287.  Because retaliation claims can be fabricated easily, summary judgment may be granted where the retaliation claim appears insubstantial.  Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted).  In the prison context, the state actor may rebut a plaintiff's claim by showing that their actions were motivated by legitimate penological objectives.  Pratt v. Rowland, 65 F.3d 802 (9th Cir. 1995).

It is Plaintiff's burden to adduce evidence sufficient to permit an inference that Defendants' actions against Plaintiff were causally connected to his protected activity.  See Hannon v. Speck, Civ. A. No. 87-3210, 1988 WL 131367 at *4 (E.D. Pa. Dec. 6, 1988) ("In bringing a §1983 action alleging such retaliation, an inmate faces a substantial burden in attempting to prove that the actual motivating factor ... was as he alleged.") (internal quotes and citation omitted),  aff'd, 888 F.2d 1380 (3d Cir. 1988)(Table).  Essentially, Plaintiff must establish a causal nexus between his protected activity and the motives of the Defendants in taking the allegedly retaliatory actions.   Typically, a plaintiff may meet this burden by "produc[ing] direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'"  Jones v. Greninger, 188 F.3d 322, 325 (5th Cir. 1999) (quoting Woods v. Smith, 60 F.3d 1161, 1166 5th Cir. 1995)).

Plaintiff's retaliation claims are not very clear.  In the operative complaint, Plaintiff claims that he was denied or delayed in receiving repair of his personal wheelchair, an eggcrate mattress, an AFO brace, leather full fingered gloves, and a catheter leg strap in retaliation for his filing grievances and accommodation requests to shower in the medical unit rather than the

40

allegedly inaccessible showers of the RHU.  Dkt. [36] at 5, ¶ 27.   Plaintiff does not allege specifically when he filed such grievances and accommodation requests.   Plaintiff also alleges that the delay in receiving all of his bowel supplies from January 13, to January 17, 2008 was in retaliation by Defendants Rozum, Visinsky, PHS, DOC, Gates, McGrath, Gehlman and Doyka. Dkt. [16] at 12, ¶ 46.  Perhaps the clearest statement of Plaintiff's retaliation claims as it relates to denial/delay in receipt of the eggcrate mattress, AFO brace, gloves, and catheter leg strap is Dkt. [124] at 13, ¶ 62, wherein he cites a grievance he filed on 3/7/08 (referenced in paragraph 54) and grievances/accommodation requests filed on 8/16/07 (paragraph 57); on 8/19/07 (paragraph 58); on 8/21/07 (paragraph 59) and on 7/ 26/2007 (paragraph 60).  However, Plaintiff fails to connect these events to any specific retaliatory acts on the part of the various Defendants and so fails to meet his burden to show a particularly suggestive chronology of events to permit causation, especially given that Plaintiff admits that Dr. McGrath approved Plaintiff for an AFO brace and catheter legstrap on October 11, 2007,  Dkt. [124] at 63, and that only thereafter was there inordinate delay but again, as was the case with the Eighth Amendment claim, there is no evidence that Dr. McGrath knew or when he knew that Plaintiff had not received these items. Hence, there is no evidence that Dr. McGrath had the requisite knowledge to even permit an inference of retaliatory animus or causation.

Moreover, as relates to the delay in obtaining repairs to his personal wheelchair (accepting merely for the sake of argument that he actually possessed such a personal wheelchair), we find that any such delay, when Plaintiff was provided with an alternative wheelchair, simply does not qualify as an "adverse action" within the contemplation of the definition found in Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001), as a matter of law.  Hence, any retaliation claim based upon the delay in repairs to his "personal" wheelchair fail as a matter

41

of law and all the Defendants are entitled to summary judgment as to this part of his retaliation claim.

In response to the Medical Defendants' brief in support of their summary judgment motion, Plaintiff finally provided some details about the alleged nature of the retaliation and pointed to the following evidence in order to meet his burden of proving retaliation.  Dkt. [169] at 17 to 19.  Plaintiff referred to the fact that on October 5, 2007, he filed Grievance 202998 requesting an AFO brace, catheter leg strap and an eggcrate mattress.  That grievance was not stamped received by Ms. Sroka  until October 9, 2007.  In no way did the grievance complain of Dr. McGrath.  Dkt. [67] at 1.  Plaintiff notes that on October 11, 2007, Dr. McGrath entered a note in Plaintiff's progress notes indicating "AFO-continue use, leg strap continue use," but denying an eggcrate mattress as not medically necessary.  Dkt. [136-2] at 14.   Plaintiff also points out that on October 18, 2007, Plaintiff filed grievance 204420 concerning being provided with 2 pair of cloth gloves, Dkt. [136-4] at 14, and then the appeal written by Plaintiff on November 2, wherein he suggested that if freezing hands and frost bite are not medical reasons for the gloves, then someone needs to return to medical school.  Dkt. [136-4] at 9.  Plaintiff states he was referring to Dr. McGrath herein.  To the extent that Plaintiff points to Grievance 202998 as the protected activity that lead Dr. McGrath to retaliate against him, we note that the entry indicated Dr. McGrath approved Plaintiff for continued use of the AFO brace and the catheter leg strap and further, in the physician's orders made these items permanent.  Dkt. [136-3] at 12.  Such evidence would not permit a reasonable juror to infer retaliation, the grant of 2 out of  3 of Plaintiff's requests simply does not make sense as evidence of retaliation.  Dr. McGrath denied Plaintiff only the use of an eggcrate mattress as not medically necessary on October 11, 2007.  Moreover, on November 2, 2007, Dr. McGrath ordered an extra mattress instead of the eggcrate

mattress.  Such actions on the part of Dr. McGrath in denying the eggcrate mattress due to concerns about such eggcrates being the source of infections, simply could not be found by any reasonable juror to have constituted an adverse action or to have exhibited retliatory animus.

Alternatively, Plaintiff utterly failed to show the required causal connection because Plaintiff adduced no evidence that Dr. McGrath had any knowledge of Plaintiff's grievances or grievance appeals prior to Dr. McGrath allegedly taking any adverse actions, indeed, Plaintiff utterly failed to show that Dr. McGrath had any role whatsoever in the January 13, 2008 to January 17, delay in Plaintiff receiving all of his bowel supplies, despite his conclusory allegations of retaliation against Dr. McGrath of being able to intervene but not doing so.  Dkt. [169] at 19, ¶ 8.  Accordingly, Dr. McGrath is entitled to summary judgment as to all retaliation claims against him.  Similarly, given the lack of evidence of PHS knowing or acting in retaliation against Plaintiff, or of possessing any policy of retaliation, PHS is also entitled to summary judgment as to the retaliation claims.

As to the filing of Grievance 204420 on October 18, 2007, concerning Plaintiff being provided with 2 pair of cloth gloves, Dkt. [136-4] at 14, again there is no evidence that Dr. McGrath knew of the filing of this grievance so as to influence him to commit any acts against Plaintiff or to refrain from committing acts of assisting Plaintiff.  This is likewise true of the November 2, 2007 appeal of the grievance, wherein Plaintiff made the statement that "if freezing your hands [and] frostbite are not medical reasons for gloves then someone needs to return to medical school."  Dkt. [170-10] at 1.  This grievance appeal, although dated November 2, 2007 was not stamped received by Superintendent Rozum until November 5, 2007, and Superintendent Rozum replied on November 6, 2007.  Plaintiff claims that this statement about going back to medical school was made about Dr. McGrath.  Dkt. [169] at 18.  There is no evidence that Dr.

McGrath ever saw this statement  or was aware of this statement.  Moreover, Plaintiff connects

this statement to the allegedly retaliatory actions of Dr. McGrath from January 13, 2008 to

January 17, 2008.  Dkt. [169] at 18, ¶ 5.  However, as noted earlier there is no evidence that Dr.

McGrath had contemporaneous knowledge about the denial of the bowel supplies.  See, e.g.,

Jubilee v. Horn, 959 F.Supp. 276, 283 (E.D. Pa. 1997)("Plaintiff makes no allegations

concerning if and what they knew about his parole process challenges [which plaintiff alleges

forms the basis for his retaliation claim against the Defendants], when they knew it, or how it

affected any decisions they made.");  McCain v. Scott, 9 F.Supp.2d 1365, 1370 (N.D. Ga.

1998)(dismissing claim where the prisoner, "McCain has pled no facts that would tend to show a

causal relationship between these events.   He has not pled, for example, facts that would tend to

show that the [correctional] Defendants had knowledge of the administrative complaints" he filed

which formed the basis of the alleged retaliation.); Harris v. Keane, 962 F.Supp. 397, 405

(S.D.N.Y. 1997)(dismissing as a matter of law a prisoner's claim of retaliation where "Plaintiff

has . . .  failed to allege, whether the particular Defendants even knew about Plaintiff's

grievances. . . .").  Thus, Plaintiff has failed to adduce evidence of the causation prong.

        To the extent that Plaintiff relies upon the filing of the present lawsuit to rest a claim of

retaliation against  Dr. McGrath, we note that the law suit as originally filed did not name Dr.

McGrath but only Rozum, Visinsky, and the DOC.  Hence, even if Plaintiff told Dr. McGrath

about the suit as he contends, Dkt. [169] at 18, ¶7, there is no apparent reason why Dr. McGrath

would want to retaliate against Plaintiff for filing a lawsuit against others.  See, e.g., Royster v.

Beard, No. 1:CV-06-0842,  2008 WL 2914516 at *6 (M.D.Pa. July 24, 2008)("Royster asserts

that Defendant Huber retaliated against him because of a previous grievance he filed complaining

about missing photographs, but in his deposition, Royster testified that he did not even mention

Huber's name in that grievance or at least did not recall doing so. Therefore, it does not make sense that Huber would retaliate against Royster by confiscating the excess books in his cell because Royster previously had filed a grievance that did not name Huber.")(citations to the record omitted).  Furthermore, Plaintiff does not say when he made Dr. McGrath aware of the suit.  Dkt. [169] at 18, ¶ 7.  We further note that Plaintiff did not file with the court a complaint which named Dr. McGrath until, at the earliest October 23, 2007.   Dkt. [9] at 9.  Nor is there evidence of record indicating precisely when Dr. McGrath received the complaint/notice of the lawsuit.

In light of the foregoing, the Medical Defendants are entitled to summary judgment as to Plaintiff's First Amendment retaliation claims.

We turn now to Plaintiff's First Amendment retaliation claims against the DOC Defendants.

The DOC Defendants pointed out the lack of evidence to show Plaintiff's filing of grievances/accommodation requests or this suit constituted a substantial or motivating factor in any of the DOC Defendants' actions or inactions.  Dkt. [132] at 17 to 19.  The DOC Defendants also pointed out that because evidence establishes that the DOC Defendants would have taken the same actions or inactions even without Plaintiff's filing of grievances/requests and this lawsuit, they are entitled to summary judgment on Plaintiff's First Amendment retaliation claims. Dkt. [132] at 19 to 20.  This was sufficient to carry their initial summary judgment burden.[15]

---

[15]  We note that the DOC Defendants also made an argument that because Plaintiff was not actually deterred by any of the allegedly adverse actions/inactions taken against him, he has failed to adduce evidence of the requisite adverse action.  Dkt. [132] at 15 to 17.  The Court is not convinced by this argument.  See, e.g., Kounelis v. Sherrer, 529 F.Supp.2d 503, 531 (D.N.J. 2008)("Defendants seem to conclude that because Kounelis was not deterred by the allegedly retaliatory conduct, then a person of ordinary firmness would not be deterred from engaging in similar acts. The law of this Circuit does not support Defendants' position. Moreover, the Court of Appeals has clearly stated that an action is adverse

In response, Plaintiff contended that the DOC Defendants' affidavits and evidence were insufficient for not complying with technical requirements under Rule 56. Dkt. [168].  Those deficiencies were corrected with leave of court, see, e.g., Dkt. [188]; Dkt. [192] and hence, this basis is no longer sufficient to withstand the DOC Defendants' summary judgment motion.

The second basis Plaintiff relies upon to resist the DOC Defendants' summary judgment motion is Plaintiff's incorporation by reference of his many many filings in this case,  Dkt. [168] at 8, without specifying how those documents create a genuine issue of material fact.  This is insufficient.  Interroval Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) ("[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n. 7 (5th Cir. 1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."); Delaney v. Deere and Co., 219 F.3d 1195, 1197 n.1 (10th Cir.  2000)("The requirement of the local rule is not satisfied by wholesale incorporation by reference-a party opposing summary judgment has the burden to *identify* the facts in dispute and reference portions of the record so-indicating.").

All of Plaintiff's claims of retaliation are fairly conclusory and lacking in any evidence of causation and/or evidence that the particular defendants even knew of his protected activities or if they knew that they took any adverse actions against him.  To the extent he claims that the DOC Defendants retaliated against him by not helping him obtain his various medical supplies

---

when a person of ordinary firmness would be deterred from exercising his constitutional rights. The Court of Appeals has never required that the plaintiff himself be deterred by the allegedly retaliatory action and it is an illogical requirement."); Curtician v. Kessler, C.A. No. 07-286 Erie,  2009 WL 2448106, at *11 (W.D.Pa. Aug. 7, 2009 (The test for adverse action, however, is objective, not subjective, and whether the plaintiff was actually deterred by the defendant's retaliatory acts is not dispositive.") (quoting Brooks v. Smith, NO. 3:CV-04-2680, 2007 WL 3275266, at *11 (M.D.Pa.2007) (citations omitted)).

(other than the bowel supplies) sooner, it is clear from the Eighth Amendment analysis that they did not believe he medically needed such supplies or needed a substitute for the soap and hence, Plaintiff could not prove that the DOC Defendants' actions/inactions were adverse or motivated by retaliatory animus.  To the extent he claims DOC Defendants retaliated against him by means of delaying his bowel supplies, it is clear as to all DOC Defendants, other than Doyka, that they acted swiftly to respond to his complaints and that by January 17, 2008, he had obtained his complete supplies, i.e., at most only two days or so after DOC Defendants were made aware of the lack of supplies was the problem rectified.  As to Doyka, Plaintiff utterly fails to show that Doyka had knowledge of any of his protected activities so as to permit an inference of retaliation.

Moreover, neither Plaintiff's counter statement of material facts, Dkt. [159], in opposition to the Defendants' statement of material facts, nor his own motion for summary judgment and the materials in support thereof establish a genuine issue of material fact as to Plaintiff's First Amendment retaliation claim.  Hence, the DOC Defendants are entitled to summary judgment as to the First Amendment Retaliation claims, as are the Medical Defendants.

### C.  ADA and Rehabilitation Act Claims

We now turn to Plaintiff's retaliation claims under the ADA and the Rehabilitation Act. The same exact analysis for retaliation under the First Amendment applies to claims of retaliation under the ADA and the Rehabilitation Act.  See, e.g., Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) ("The elements of a retaliation claim under 42 U.S.C. § 1983 predicated on the First Amendment and under the Rehabilitation Act are the same."); Bennett v. Henderson, 15 F.Supp.2d 1097, 1112 (D. Kan. 1998), aff'd, 172 F3d 62 (10th Cir. 1999) ("The elements of the prima facie case of retaliation are the same whether a plaintiff proceeds under the Rehabilitation Act, ADA, ADEA, or Title VII");  Stouch v. Township of Irvington, No. 03-6048 ,

47

2008 WL 2783338, at *15 (D.N.J.  July 16, 2008)("Plaintiffs' retaliation claim, pursuant to the

Americans with Disabilities Act, fails for the same reasons as their First Amendment retaliation

claim-Plaintiffs fail to show that Stouch engaged in protected activity. Further, even if Stouch

engaged in protected activity, there is no evidence indicating a causal connection between the

protected activity and Stouch's termination."), aff'd, __ Fed.Appx. __, 2009 WL 4048849  (3d

Cir. Nov 24, 2009).   Hence, the foregoing analysis of the First Amendment retaliation claims

likewise disposes of Plaintiff's retaliation claims under the ADA and the Rehabilitation Act.

Accordingly, all of the Defendants are entitled to summary judgment as to the retaliation claims

under the ADA and the Rehabilitation Acts.

In light of the grant of summary judgment as to the Defendants on all of Plaintiff's federal

law claims, the Court denies Plaintiff's own summary judgment as to those same federal law

claims as moot.  See, e.g., Tunica-Biloxi Tribe of Louisiana v. Warburton/Buttner, No. Civ.A.

04-1516, 2005 WL 1902889, at 1 n.1 (D.D.C. July 20, 2005)("Because this Court is granting the

defendant's dismissal motion, the plaintiff's summary judgment motion is now moot and

therefore will be denied").[16]

The foregoing leaves only state law claims to be adjudicated.  Those state law claims

were described in the earlier opinion as being state constitutional law claims against all

defendants and a state law claim of intentional infliction of emotional distress against the

Medical Defendants.  Dkt. [83] at 25.   Because the Court is granting summary judgment as to all

---

[16]  To the extent that any of the foregoing analysis relies upon portions of the record not specifically
pointed to or relied upon by the parties, the Court notes that "[t]he district court has discretion to go
beyond the referenced portions of these [summary judgment] materials, but is not required to do so."
Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998).

of the federal law claims, it declines to exercise supplemental jurisdiction over the state law claims.[17]

Accordingly, the Medical Defendants' summary judgment motion, Dkt. [137], is granted in Part, as to all of Plaintiff's federal law claims.  The DOC Defendants' summary judgment motion, Dkt. [131], and their Supplemental Summary Judgment Motion, Dkt. [147], are granted in part as to all federal law claims.  The Plaintiff's motion for summary judgment, Dkt. [121], is denied as to the federal law claims and the Court declines to exercise supplemental jurisdiction over the remaining state law claims and so declines to rule on the summary judgment motions to the extent they sought summary judgment as to the state law claims.  The Clerk should mark the case closed.

By the Court,

/s/ *Amy Reynolds Hay*
Chief United States Magistrate Judge

---

[17]  See, e.g., Boneburger v. Plymouth Township, 132 F.3d 20, 23 n.1 (3d Cir. 1997)("where federal claims are dismissed before trial, the district court 'must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'")(quoting Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995));  28 U.S.C. § 1367(c)(3) which permits a district court to "decline to exercise supplemental jurisdiction over a [state law] claim ... if [it] has dismissed all claims over which it has original jurisdiction . . . .").  The grant of summary judgment by a court on the federal claims is included within the meaning of the phrase contained in Section 1367(c)(3), i.e., "dismissed all claims."  Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir. 1976) ("If it appears that the federal claim is subject to dismissal under F.R.Civ.P. 12(b) (6) or could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances.");  O'Brien v. Maui County, 37 Fed.Appx. 269, 273 (9th Cir. 2002) ("Having disposed of all of O'Brien's federal claims on summary judgment, the district court declined to assert supplemental jurisdiction over O'Brien's state law negligence claims. O'Brien contends that this constituted reversible error.  There is no basis for her contention. Under 28 U.S.C. § 1367(c)(3), a district court may, in its discretion, decline to exercise supplemental jurisdiction over related state law claims once it has 'dismissed all claims over which it has original jurisdiction....' As the district court properly dismissed the federal claims, it did not abuse its discretion in dismissing the state law negligence claims as well.")(footnote omitted).

Dated: 16 December, 2009


cc:     James D. Evans
        ET-4625
        SCI Somerset
        1600 Walters Mill road
        Somerset, PA 15510

        All counsel of record via CM-ECF